## ERHARDT v. BALLIN et al.

(Circuit Court of Appeals, Second Circuit. November 2, 1906.)

No. 12 (15,248).

1. CUSTOMS DUTIES—MERCHANT APPRAISERS—PRESUMPTION OF DUE SELECTION.
   In order to overcome the presumption that a collector of customs in selecting a merchant appraiser of imported merchandise, under section 2930, Rev. St., made a proper appointment, it is not enough to create a mere uncertainty. It must be clearly shown that the appointee did not meet the statutory requirement of being "familiar with the character and value of the goods in question."

2. EVIDENCE—PUBLIC OFFICERS—PRESUMPTION OF DUE PERFORMANCE OF DUTY.
   Where it is the official duty of a collector of customs to appoint an officer possessing qualifications prescribed by statute, it is to be assumed that in making the appointment he performed his duty in that regard.

In Error to the Circuit Court of the United States for the Southern District of New York.

The writ of error in this case was sued out in behalf of Joel B. Erhardt, formerly collector of customs at the port of New York, against Julius Ballin and others, comprising the firm of Ballin, Joseph & Co. The court below directed a verdict for the importers in the following terms:

"PLATT, District Judge. I must confess it is one of the most difficult things to do to separate my personal knowledge from my judicial knowledge on this particular point; but I cannot rid myself of the feeling that the testimony is sufficient to establish the proposition that Mr. Leahy was not, within the statute, a competent merchant appraiser, on the question of value at that particular time. I think I am right in coming to that conclusion, divorcing myself from my personal knowledge; and I believe the testimony in this case gives me quite as strong a sanction for saying that Mr. Leahy was not a competent appraiser as the testimony in the case referred to gave Judge Townsend for saying that Mr. Ballin was not a competent appraiser in the case then before the court. I shall have to take this view of it; and I therefore direct the jury to render a verdict for the plaintiff for the amount of their claim as shown by the protest and the bill of particulars, together with interest and costs, subject to correction and adjustment at the custom house by the collector of the port, under the direction of the court, as to the amount, and as to all the formalities of and requisites of suit. Upon all other items embraced in the plaintiff's claim you are directed to render a verdict for the defendant."

J. Osgood Nichols, Asst. U. S. Atty., for plaintiff in error.
Frederick W. Brooks, for defendants in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. There is no question as to classification of the imported articles, but only as to their valuation; and the single point raised is whether the merchant appraiser who, together with a general appraiser, reappraised the goods, possessed the statutory qualifications. The importation occurred prior to the passage of the customs administrative act in 1890, which created the Board of General Appraisers, and the reappraisement was had under section 2930, U. S. Rev. St. That section provides that the "collector shall select one discreet and experienced merchant to be associated with one of the gen-

150 F.—34

eral appraisers wherever practicable, or two discreet and experienced merchants, citizens of the United States, familiar with the character and value of the goods in question, to examine and appraise," etc. The value with which the appraiser is to be familiar is the current market value or wholesale price of similar articles in the principal markets of the country from which the merchandise has been imported, since that is the value which is to be appraised. U. S. Rev. St., §§ 2905, 2906, 2907 [U. S. Comp. St. 1901, p. 1923]. The provisions of section 2930 are very plainly expressed, and hardly require any exposition. The merchant appraiser must be familiar with the character and value of the goods in question; that is, with goods "of similar description," goods of the same class and grade and value, not goods dissimilar to those imported. Moreover, he must have such personal knowledge of their character and value as will fairly warrant the conclusion that he is familiar therewith. How such familiarity is to be acquired, however, is not prescribed by the statute. This section has been several times before the courts. In Oelberman v. Merritt, 123 U. S. 356, 8 Sup. Ct. 151, 31 L. Ed. 164, the Circuit Court had refused to allow the merchant appraiser to testify what familiarity he had with silk velvets at the time he was appointed. This was held to be error; the court saying:

"In regard to the question whether [the merchant appraiser] was a competent witness to prove that he was not familiar with the character and value of silk velvets we are of the opinion that his evidence on that subject was admissible. As the question of his familiarity with the article and with its value necessarily depended upon the nature and, to some degree at least, upon the extent of his experience in connection with the article, no one could know what that experience was so well as himself. If he is to be excluded as a witness on the subject, the court and the jury and the parties would be deprived of the best testimony within reach."

In Magone v. Origet, 70 Fed. 778, 17 C. C. A. 363, this court sustained the Circuit Court in directing a verdict in favor of the importer, where the merchant appraiser himself testified to facts from which the court reached the conclusion that he was not familiar with the character and value of the goods in question. Both sides asked for the direction of a verdict, and neither side asked to go to the jury. The facts testified to by Ballin (the merchant appraiser in that case) are not set forth in the report above cited; but counsel for defendant in error, who has examined the record, states them as follows:

"Origet imported cloths cut into lengths suitable for making overcoats; * * * and intended for sale to merchant tailors * * * high-priced woolens. * * * Ballin dealt in a very different class of goods—low class goods for the wholesale clothing trade."

This court said:

"The question is purely one of fact, which, when submitted to the jury, would naturally be accompanied by some instructions from the court; but, if it is left by both parties to the court, neither can complain if his opinion is justified by any of the testimony."

In Megroz v. Erhardt, tried in the Circuit Court, Southern District of New York, November 14, 1892 (not reported, but quoted from in the brief of defendant in error), it appeared that the merchant ap-

praiser, a manufacturer of the same goods as those in suit, there testified that:

"He examined the invoices of merchants who dealt in such goods in order to inform himself as to their value only when he was being appointed appraiser. When that employment ceased, he ceased inquiry; his own business not requiring him to possess special knowledge on that subject."

The court held he was not qualified, because the statute required an appraiser whose knowledge as to the value of the goods came not solely from a special examination of the elements which entered into their cost on the other side, but whose knowledge as to their value on the other side "was acquired in the transaction of his own business by trafficking in the goods."

In the case at bar the goods were imported in 1889 and action begun the same year, but it was not brought on for trial until 1904. Meanwhile the merchant appraiser, Leahy, died (in 1898), so that the witness who best knew what familiarity he had with the character and value of similar goods was not called to testify. The main evidence on that part of the case is that of his partner, Van Ingen. It is the official duty of the collector to select an appraiser possessing the statutory qualifications; and at the outset it is to be assumed that the public officer performed his duty in that regard. Nat. Acc. Soc. v. Spiro, 94 Fed. 750, 37 C. C. A. 388. The burden, therefore, is with the plaintiff to overcome that presumption by sufficient affirmative proof. In the case at bar we are of the opinion that the proof is insufficient to accomplish that result. Keyser, who was custom house examiner of English woolens for five years prior to 1889, testified that the firm of E. H. Van Ingen & Co. dealt generally in the high-priced goods and not in low class goods, that he examined or passed all their goods at that time, and that "a majority of their goods were high-priced goods." To the question whether or not they imported woolen cloths of the value of three shillings a yard for 56-inch goods—which are the goods in controversy—he replied:

"They may have. I could not say positively. It is 16 years ago, and I don't remember that long."

The plaintiff described the difference between the goods he dealt in exclusively and the finer goods which the Van Ingen firm handled and asserted that they never imported the cheap goods which plaintiff's firm brought over, but on cross-examination he frankly admitted that this assertion was only an inference, because he never met any competition, that he didn't know all the worsteds they bought. This evidence is certainly insufficient to establish the proposition that the Van Ingen firm did not deal in goods of the character and value of those in suit sufficiently to become familiar with them.

The only other witness called also by the plaintiff was E. H. Van Ingen, the senior partner, who testified that in 1889 the firm consisted of himself and Leahy. When shown the invoices of the goods in controversy, he said that his firm dealt (at the time) in worsted coatings of such prices and such weights, and had a separate department for the wholesale clothing trade for which such goods were imported. The fact that the majority—or even the large majority—of their im-

portations were of a higher grade, does not alter the situation. Upon the proof it cannot be held that they did not deal in the lower priced goods to a sufficient extent to become familiar with them. The witness further testified that Leahy went often to England, was in England several times, but whether he was there in 1888 or 1889 witness could not say from mere recollection, but had no doubt he could ascertain. He was not asked to do so, nor recalled after he had the opportunity to examine the records of his business. If it were necessary for the plaintiffs to show that Leahy was not in England during those years, they certainly failed to do so. Witness also testified, "I don't think Mr. Leahy ever bought any goods for us in England." This statement is not positive, and is qualified by Van Ingen's further testimony. He said that Leahy was connected with the firm for 30 years before he died; that foreign goods were bought by the agent who had charge of the firm's business in Yorkshire; that Leahy took part in the buying of goods in 1889; he had a general understanding and assisted in every way in the management of the business both of buying and selling; was there to do anything if witness became incapacitated, ready to step into his place and do anything that he did. "The firm had a house in Huddersfield, and the man who managed the business there came over here twice a year, spent considerable time here, brought over patterns of all sorts of goods, and consulted with us, Mr. Leahy and myself, concerning them, and then we would take orders here and he would go back and make contracts, or he would leave samples here and we would cable orders. We did it in the way that such business is usually done." Leahy and the witness conferred constantly and intimately on the conduct of the business. Leahy, as we have seen, went often to England, so did the witness, usually twice a year. The purpose in going there was he says:

"In connection with the buying of goods and making contracts for goods and generally looking after the business. In doing that, it was necessary in order to familiarize myself with the goods that I expected to deal in or buy, to look at all the samples of stock of various manufacturers, and see who sold goods cheapest. If I did not go to the different houses handling that line of goods, they came to us, which is the rule over there rather. And they brought samples."

In all this there is nothing which necessitates a conclusion that either partner was unfamiliar with the character and value abroad in 1889 of goods similar to those on the invoices. It is a very different case from that presented in Megroz v. Erhardt, supra, where the merchant appraiser was a manufacturer, whose business did not require him to possess special knowledge on the subject of values in a foreign market. In the case at bar the money of the firm was at risk in a business in which it bought abroad and sold here. It was essential to success in such business that the purchases should be made at fair market values; otherwise the firm's competitors here would soon get the best of them. As prudent business men with their own money at risk, it would seem reasonable to suppose that they would familiarize themselves with the character, price, and value of goods for which their money was expended, even though some subordinate gave more constant and special attention to the details of negotiations. It is, of course, conceivable

that the members of a firm with a very extensive business might leave to some trusted employé the entire subject of purchasing goods of some particular class, with full power to decide what prices to pay and without any inquiry by them as to whether the prices paid were "market" or not.   So, too, it is conceivable that the business of a firm may be so distributed among its members that one partner, attending it may be to the financial part, credits, discounts, etc., may be wholly unfamiliar with goods which some other partner knows all about.   But, to overcome the presumption that the collector made a proper appointment, the plaintiff must do more than create a mere uncertainty, and in our opinion the evidence in this case is not sufficiently strong to warrant the court in holding that the merchant appraiser was not possessed of the qualifications which the statute required.   Had he been called as a witness, no doubt we would have data from which a conclusion, one way or the other, might confidently be drawn; but, as the record stands, it would be mere blind guesswork to decide either way, and therefore the presumption must stand and the judgment be reversed.